UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SHELIA ALLGOOD, ET AL. | CIVIL ACTION |
| VERSUS | NUMBER 06-3506 |
| GLAXOSMITHKLINE PLC, ET AL. | SECTION "L" (5) |

### ORDER & REASONS

Before the Court are multiple pretrial motions in this prescription drug case involving an allegation of Paxil-related suicide. Most of these motions seek partial summary judgment on various individual issues, although some of the motions seek rulings that would be dispositive of this case. The Court heard oral argument and took all of the motions under submission. For the following reasons, the Court finds that the Plaintiffs' claims must be independently dismissed under both the learned-intermediary doctrine and the doctrine of judicial estoppel.

### I.   BACKGROUND

Shelia Allgood, Francis Powell, and Robin May ("Plaintiffs") are sisters. Their father, Jake Palermo, worked as a longshoreman on New Orleans wharves from approximately 1962 until 1982. In 2000, Mr. Palermo was diagnosed with prostate cancer, and in 2002 he was diagnosed with terminal lung cancer. Mr. Palermo also suffered from depression.

On April 11, 2003, Dr. Robert Kessler prescribed the antidepressant drug Paxil, 10 mg daily, to Mr. Palermo for his depression and to increase his appetite following a bout with

pneumonia.  Mr. Palermo filled his prescription that very same day and presumably began taking the drug immediately.[1]  Paxil is manufactured and marketed by the Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") and is designed to work by selectively inhibiting the re-uptake of serotonin.[2]  Three days later, on April 14, 2003, at the age of 76, Mr. Palermo committed suicide with a gunshot wound to his head.  The Plaintiffs are Mr. Palermo's sole heirs and have been involved in two separate litigations since his death.

First, on January 23, 2003, over two years before the filing of the instant suit and prior to his death, Mr. Palermo sued his former employers, certain asbestos manufacturers, ship-repair companies, and the Port of New Orleans in Louisiana state court.  Mr. Palermo (and later his daughters, who were substituted as plaintiffs following Mr. Palermo's death) alleged that the defendants had exposed him to asbestos during his employment as a longshoreman.  In an amended petition, Mr. Palermo's daughters alleged that his suicide was caused by his exposure to asbestos.  After settling with several of the defendants, the daughters proceeded to trial in Civil District Court for the Parish of Orleans.  Following a bench trial, the court awarded the daughters $2.5 million, finding that Mr. Palermo's depression-induced suicide was a direct result of his occupational exposure to asbestos.  On appeal, the Louisiana Fourth Circuit Court of

---

[1] GSK disputes whether Mr. Palermo ever took any Paxil pills, given that no one witnessed him ingest the drug and that the remaining pills were later thrown away by one of his daughters.  Indeed, one of GSK's motions seeks summary judgment, or alternatively a spoliation of evidence instruction, on these grounds.  But, as explained below, because the Court ultimately need not reach this issue, it will assume here that Mr. Palermo began taking Paxil upon filling his prescription.

[2] Paxil is in the class of drugs known as Selective Serotonin Reuptake Inhibitors ("SSRIs").  For a more detailed scientific and regulatory history of Paxil, see *Vanderwerf v. SmithKlineBeecham Corp.*, ___ F. Supp. 2d ___, 2008 WL 94673, at *2-5 (D. Kan. Jan. 9, 2008).

Appeal reversed the trial court's finding of liability without reaching the issue of the causal nexus between Mr. Palermo's suicide and his exposure to asbestos. *See Palermo v. Port of New Orleans*, 933 So. 2d 168 (La. App. 4 Cir. 3/15/06). The same result was reached by the appellate court following rehearing and the Louisiana Supreme Court subsequently denied writs. *See Palermo v. Port of New Orleans*, 951 So. 2d 425 (La. App. 4 Cir. 1/19/07), *writ denied*, 957 So. 2d 1289 (La. 2007).

Second, on February 15, 2006, the Plaintiffs filed the instant suit against GSK in the 24th Judicial District Court for the Parish of Jefferson.[3] GSK removed this case to federal court on the basis of diversity jurisdiction under 28 U.S.C. § 1332. In the instant case, the Plaintiffs allege that their father's use of Paxil contributed to his suicide. The Plaintiffs assert wrongful death and survival claims under the Louisiana Products Liability Act ("LPLA"), La. Rev. Stat. Ann. § 9:2800.51, *et seq*. Specifically, the Plaintiffs invoke all four provisions of the LPLA, alleging that Paxil was unreasonably dangerous (1) in construction or composition, (2) in design, (3) due to an inadequate warning, and (4) because it did not conform to an express warranty.[4]

## II.    PRESENT MOTIONS

There are currently nine pretrial motions before the Court. GSK has filed seven of these motions, six of which seek summary judgment on various issues and one that challenges the

---

[3] In their state court petition, the Plaintiffs improperly identified the defendant as GSK's ultimate parent company, GlaxoSmithKline PLC.

[4] The Judicial Panel on Multidistrict Litigation has centralized certain cases involving Paxil in the United States District Court for the Central District of California. *See In re Paxil Prods. Liab. Litig.*, 296 F. Supp. 2d 1374 (J.P.M.L. 2003). However, it appears that cases such as this involving allegations of suicide have generally not been made part of the MDL. *See, e.g., Hoppe v. SmithKline Beecham Corp.*, 437 F. Supp. 2d 331 (E.D. Pa. 2006); *Richardson v. GlaxoSmithKline*, 412 F. Supp. 2d 863 (W.D. Tenn. 2006).

Plaintiffs' causation expert on *Daubert* grounds. GSK's six summary judgment motions address the following issues: (1) the learned-intermediary doctrine and the Plaintiffs' warning claim, (2) the Plaintiffs' remaining claims under the LPLA, (3) the doctrine of judicial estoppel, (4) the Plaintiffs' claim for survival damages, (5) the alleged lack of evidence of product usage in this case, and (6) federal preemption. In addition, the Plaintiffs have moved for partial summary judgment challenging several of GSK's affirmative defenses. Finally, the Plaintiffs have also moved to unseal certain exhibits to several of the above motions which the Court previously allowed to be filed under seal. For the following reasons, the Court finds that GSK's first three motions for summary judgment are well founded and are dispositive of this case. Therefore, the remaining six motions in this case are moot and will not be addressed.

### III.   LAW & ANALYSIS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits show that there is no genuine issue as to any material fact and that the defendant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. If the party moving for summary judgment demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). "[A] dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986). Therefore, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material*." *Willis*, 61 F.3d at

315. The burden of demonstrating the existence of a genuine issue is not met by "metaphysical doubt" or "unsubstantiated assertions." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Matsushita*, 475 U.S. at 588). The Court must "resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.* The Court does not, "in the absence of proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* If the evidence leads to only one reasonable conclusion, summary judgment is proper. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

    **A.**    **LPLA**

As noted above, the Plaintiffs have asserted claims under all four provisions of the LPLA. In its first motion for summary judgment (Rec. Doc. 53), GSK seeks dismissal of the Plaintiffs' inadequate warning claim pursuant to the learned-intermediary doctrine. In a cross-motion on this issue (Rec. Doc. 26), the Plaintiffs ask the Court to strike GSK's learned-intermediary defense. In its second motion for summary judgment (Rec. Doc. 50), GSK seeks dismissal of the Plaintiffs' remaining claims under the other three provisions of the LPLA, namely their construction or composition, design, and express warranty claims. The Court will address these two sets of motions separately, but finds that both are well founded, such that the Plaintiffs' claims under all four provisions of the LPLA fail on the merits.

    *1.*    *Inadequate Warning*

In its first motion for summary judgment (Rec. Doc. 53), GSK seeks dismissal of the Plaintiffs' inadequate warning claim under the learned-intermediary doctrine, pursuant to which "a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of the dangers of harm from a drug." *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254,

265 (5th Cir. 2002). In a cross-motion on this issue (Rec. Doc. 26), the Plaintiffs ask the Court to strike GSK's learned-intermediary defense. The United States Court of Appeals for the Fifth Circuit recently set forth the contours of the doctrine under Louisiana law:

> Louisiana applies the "learned intermediary doctrine" to products liability claims involving prescription drugs. . . . This court has acknowledged that there is a two-pronged test governing inadequate-warning claims under the LPLA when the learned intermediary doctrine is applicable. First, the plaintiff must show that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician. *Willett v. Baxter Int'l Inc.*, 929 F.2d 1094, 1098 (5th Cir. 1991). Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury. *Id.*

*Stahl*, 283 F.3d at 265-66.

GSK argues that it adequately warned of the risks associated with Paxil and that Mr. Palermo's prescribing physician was aware of these warnings. But even if there is a question of fact regarding the adequacy of the warnings, GSK argues that Dr. Kessler's deposition testimony demonstrates that he would have made the same prescribing decision regardless of a stronger warning. The Plaintiffs respond by asking the Court either to reject the learned-intermediary doctrine in its entirety or redefine Louisiana's version of the doctrine to recognize an exception based on "direct-to-consumer" advertising. Alternatively, the Plaintiffs argue that GSK cannot rely on the learned-intermediary doctrine because the warnings accompanying Paxil in 2003 were inadequate as a matter of law.

Notwithstanding the Plaintiffs' urging to revisit the wisdom of the learned-intermediary doctrine, the Fifth Circuit's decision in *Stahl* governs the instant case and will be faithfully applied. Thus, assuming for the purposes of the instant motions that there is a genuine factual dispute concerning the adequacy of the warnings in this case, GSK will nevertheless be entitled to summary judgment if it can demonstrate the absence of a genuine factual dispute concerning

the second prong of the learned-intermediary test, namely causation.  That is, GSK will be entitled to summary judgment if the record taken as a whole could not lead a rational trier of fact to find "that but for the inadequate warning, the treating physician would not have used or prescribed the product." *Ferguson v. Proctor & Gamble Pharms., Inc.*, 353 F. Supp. 2d 674, 679 (E.D. La. 2004) (internal quotation omitted).[5]

Upon a thorough review of the prescribing physician's deposition testimony given on November 1, 2007, the Court finds that there are no genuine factual disputes regarding whether or not a stronger warning would have changed Dr. Kessler's decision to prescribe Paxil to Mr. Palermo.  Indeed, Dr. Kessler's testimony clearly reveals that stronger warnings concerning the risk of suicide would not have changed his decision to prescribe Paxil in this case.  For example, in response to questions by GSK's counsel, Dr. Kessler first testified as follows:

> Q.   Knowing what you know today, after this deposition and all the papers that have been shown to you, the letters that have been shown to you, the article from Jurlink that's been shown to you, would you change anything that you have done or did with respect to Mr. Palermo?
>
> A.   No.
>
> Q.   Would you change anything with respect to your prescription that you gave him of Paxil?
>
> A.   No.
>
> Q.   You have seen subsequent labels.  You have seen subsequent letters.  Now that you have seen all of those, would that change anything you did with respect to your prescription of Paxil to Mr. Palermo?

---

[5] In this respect, the Plaintiffs' argument that GSK's motion should be denied because it must first demonstrate that the warnings were adequate reverses the applicable burden of proof on the underlying claim.  Indeed, to prevail at trial, "a plaintiff must show not only that a warning was inadequate, but that it was a 'producing cause' of his injuries." *McNeil v. Wyeth*, 462 F.3d 364, 372 (5th Cir. 2006) (discussing the learned-intermediary doctrine under Texas law).

> A. At that time, no.

*See* Kessler Dep. at 140:7—140:24 (Rec. Doc. 53-10). In response to questions from Plaintiffs' counsel concerning a recent journal article comparing various antidepressants, the doctor gave the following testimony:

> Q. And if you had seen [the journal article] in '03 and saw that in a peer reviewed journal the risk was five times greater, you would have given him a different antidepressant instead of an SSRI, wouldn't you?
>
> A. On my experience with what I have had with SSRIs over the past six or seven years, I might have told the family to be aware of the possible increase, but I would still have given him one.
>
> Q. Okay. But—
>
> A. To me, these are still good drugs.
>
> . . . .
>
> Q. Would you have informed the patient so that he could make his own consent weighing that risk?
>
> A. I think I would have possibly informed the family, but not necessarily informed the patient.

*See* Kessler Dep. at 142:2—143:12 (Rec. Doc. 53-10).

Near the end of the deposition, however, Dr. Kessler was given an opportunity to explain himself in his own words, without being cleverly led by counsel. It is this testimony that demonstrates to the Court the lack of a genuine factual dispute concerning causation in this case, and it is this testimony upon which the Court principally relies in dismissing the Plaintiffs' inadequate warning claim. Thus, the Court will reproduce the relevant testimony at length:

> Q. . . . . Doctor, I guess I am a little confused. I don't know how to square what you said earlier when you said you wouldn't want to tell all of these patients all of these different things to look for all of these things because you would be concerned about, well, they will single in and focus on one thing and maybe not alert——be alert to another thing. And now, as I understand,

        you're saying that you might have informed—you might have informed the family about the difference in a risk between a five-fold increase in a risk between an SSRI and another antidepressant? Is that your testimony?

A. As a habit, I do not inform any of the patients about the risk of suicide with any of these drugs. I basically inform the family or the patient, as I said before, for any change in their condition, to—to notify me of that. Had I known this, I don't—in all honesty, I do not think I would necessarily have changed what I do, because I think it—it will affect the way both the families and the patients respond, you know, to their—to the treatment.
        There's becoming—starting to become a gray zone of what's best for the patient and, you know, or what we perceive as being best for the patient and what the realities of the treatments are.
        Had I been aware of numerous patients in, you know, my practice, or having had a problem with this, I would have obviously, you know, informed the families of this potential possibility. Over the last eight to ten years I have used SSRIs without any problems. I have had no patients, you know, other than Mr. Palermo, commit suicide. And I've had no families call me to tell me that they thought that their family member was possibly contemplating suicide. I have also over the years experienced when I tell patients those specific side effects of the drugs that might occur, the patients refuse to take the drug. And even though in the long run this would have been the best thing for their—their quality of life, they now suffer because of the possibility of experiencing this problem. And this is why I have tried to have it where patients' families—and I tell them, "If you have any questions or if there's any change in your condition, to get in touch with me so that I can decide on what is going to happen."

Q. And I understand that to be your testimony.

A. And if a patient—If, you know—If I tell a patient or a family there's the potential for suicide, what is that patient's reaction going to be? What's that family's reaction going to be? You know, what is the likelihood that somebody's going to keep an eye on that patient 24/7. The reality of it is, it's not going to happen.

Q. Well, Doctor—

A. I have to—And I have to be—

Q. I don't want to stop you. Finish your answer. I have another question.

A. And I—I just feel that I had to do—I have to do what's best for the patient at that point in time. There are risks with every drug that we use, and if—if—if any logical person listening to the side effects of the drugs that we

>
> use, there's no logical reason anybody would ever take any of them. But, you know, they're hoping for that little bit of benefit. So I don't as a habit, and I still don't as a habit inform the patients of potential for suicide.

*See* Kessler Dep. at 144:3—147:6 (Rec. Doc. 53-10). Finally, Dr. Kessler's explanation continued in response to the concluding questions from Plaintiffs' counsel:

> A. The key, the bottom line is if you take away the medical-legal that is being pushed now, no, I would not change what I have done. The atmosphere we practice in today, the medical-legal is changing what we can and can't do and, unfortunately, I feel it's harming patients. So if you're going to back me into a corner and say knowing this information, you know, what would I do from a medical-legal aspect, I would have to, you know, inform somebody of that information. Do I think it's the best for the patient? No.
>
> Q. My question really concern[s] what you would do if the source of the information is GlaxoSmithKline.
>
> A. The bottom line is, I'll tell you what this is. I go by my experience. The hell with all the other stuff, you know. You know, I—I have treated thousands of patients I have given this drug to. If all of a sudden I noticed I—you know, over the years I have noticed, okay, I have had five, six, seven, ten or fifteen patients who committed suicide and an article like this comes out, yeah, I would probably change what I do. But I have had one out of all—in SSRIs, the predominant antidepressant that I prescribe. It's either Lexapro, Celexa or it's—or it's Paxil or the generic Paxil, whatever. And I have had one suicide in thousands. So, you know, if—You know, if I had—Like you said, if these articles came out and I had yes, I looked back and I said, look, I have got 15 people who committed suicide over the last ten years, you know, then I would say, well, maybe that runs with what these articles are saying and maybe I need to change to something else.

*See* Kessler Dep. at 151:23—153:10 (Rec. Doc. 53-10).

Based on the above testimony, it seems clear to the Court that Dr. Kessler treats very sick people and relies principally on his personal medical experience, and that even knowing everything he knows today, Dr. Kessler still would have prescribed Paxil to Mr. Palermo. Accordingly, because the second prong of the learned-intermediary test is lacking, the Court will grant GSK's motion for summary judgment on the learned-intermediary doctrine and deny the

Plaintiffs' cross-motion on this issue.[6]

### 2.    *Construction or Composition, Design, and Express Warranty*

In its second motion for summary judgment (Rec. Doc. 50), GSK seeks dismissal of the Plaintiffs' remaining claims under the other three provisions of the LPLA, namely construction or composition, design, and express warranty. The Plaintiffs do not oppose the dismissal of their design and warranty claims, and concede that this case is primarily a warnings case. Accordingly, the Plaintiffs' design and warranty claims will be dismissed. However, the Plaintiffs ask the Court not to dismiss their construction or composition claim, arguing that Paxil is unreasonably dangerous not only due to an inadequate warning, but also because "the product deviated in a material way from the manufacturer's specifications or performance standards for the product." La. Rev. Stat. Ann. § 9:2800.55. The focus of a "construction or composition" claim is the specific product that was in hand at the time of use, as opposed to the product in general. *See Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 262 (5th Cir. 2002) ("The 'unreasonably dangerous in construction or composition' provision of the LPLA provides a remedy for damages caused by a product that is defective due to a mistake in the manufacturing process."). Accordingly, because the Plaintiffs do not allege that there was a manufacturing defect with the specific Paxil pills that Mr. Palermo allegedly ingested, their construction or

---

[6] For better or for worse, cases governed by the learned-intermediary doctrine often turn on the testimony of the prescribing physician, and on his or her speculation as to what may have been done differently in various hypothetical situations. *See, e.g., Ackermann v. Wyeth Pharms.*, 471 F. Supp. 2d 739, 745-48 (E.D. Tex. 2006), *appeal docketed*, No. 06-41774 (5th Cir. Dec. 28, 2006). And while it would appear that in this Circuit a plaintiff may be able to supplement such "subjective" testimony with "objective evidence of how a reasonable physician would have responded to an adequate warning," *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992) (discussing Mississippi law and relying upon *Hermes v. Pfizer, Inc.*, 848 F.2d 66, 69-70 (5th Cir. 1988)), the Plaintiffs have produced no such additional evidence in this case.

composition claim will be dismissed as well.

### B. Judicial Estoppel

In a separate motion for summary judgment (Rec. Doc. 48), GSK alternatively asks the Court to dismiss the Plaintiffs' claims in their entirety based on the doctrine of judicial estoppel. This discretionary equitable doctrine has developed "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotations and citations omitted); *see also Hotard v. State Farm Fire & Cas. Co.*, 286 F.3d 814, 818 (5th Cir. 2002) ("[A] party cannot advance one argument and then, for convenience or gamesmanship after that argument has served its purpose, advance a different and inconsistent argument."); *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("Judicial estoppel is a common law doctrine by which a party who has assumed one position in his pleadings may be estopped from assuming an inconsistent position.").[7] "[S]everal factors typically inform the decision whether to apply the doctrine in a particular case." *New Hampshire*, 532 U.S. at 750.

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

---

[7] As the United States Court of Appeals for the Sixth Circuit has explained, "[c]ourts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against playing fast and loose with the courts, blowing hot and cold as the occasion demands, or having one's cake and eating it too. Emerson's dictum that a foolish consistency is the hobgoblin of little minds cuts no ice in this context." *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 472-73 (6th Cir. 1988) (internal quotations and citations omitted).

*Id.* at 750-51.

In this case, GSK argues that the current position taken by the Plaintiffs with respect to the cause of their father's suicide (*i.e.*, Paxil) is inconsistent with the position they took in the prior litigation against his former employers (*i.e.*, exposure to asbestos). Moreover, GSK argues that the Plaintiffs were successful in persuading the trial court in the prior litigation to accept their previous argument such that this Court should now prevent them from asserting an inconsistent argument in the instant case. The Plaintiffs argue that there is no inconsistency in their positions given the "multifactorial" nature of suicide and the fact that there can be more than one proximate cause of an event under Louisiana law. The Plaintiffs also argue that they were not aware of Paxil's alleged suicide risk until February 2005, after the conclusion of the first trial in state court.

There is no real dispute in this case concerning the *substance* of the two positions taken by the Plaintiffs with respect to the cause of their father's suicide. In the prior litigation, the Plaintiffs maintained that their father's suicide was the result of his exposure to asbestos. In this case, the Plaintiffs contend that their father's use of Paxil caused him to have suicidal tendencies, which ultimately contributed to his suicide. *See* Pls.' Pet. ¶ VI & VII (Rec. Doc. 4). Thus, the first issue presented in this motion is whether these two positions are "clearly inconsistent."

The Court finds that these two positions are clearly inconsistent. Although it is no doubt true that many factors may contribute to any given suicide, this is somewhat beside the point. Rather, what is important for purposes of the instant motion is that the Plaintiffs did not make such an argument in the prior litigation, but attempt to do so here. Indeed, the Plaintiffs' position in this case that *several* factors contributed to their father's suicide is clearly inconsistent with

the position they took in the prior litigation that *only one* factor contributed to their father's suicide. The fact that the trial court in the previous litigation needed only to find that asbestos was "a" cause of Mr. Palermo's suicide, not "the" sole cause, is thus irrelevant.

It is also beyond dispute that the Plaintiffs succeeded in persuading the trial court in the previous litigation to accept their first position. Although the $2.5 million verdict was later reversed on appeal, "the 'judicial acceptance' requirement does not mean that the party against whom the judicial estoppel doctrine is to be invoked must have prevailed on the merits." *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 398-99 (5th Cir. 2003) (quotation omitted). Indeed, "the previous court's acceptance of a party's argument could be either as a preliminary matter or as part of a final disposition." *Id.* at 398 (internal quotation omitted). As noted above, following a bench trial in the previous litigation, the court agreed with the Plaintiffs' first position and found that Mr. Palermo's depression-induced suicide was a direct result of his occupational exposure to asbestos. *See Palermo v. Port of New Orleans*, 951 So. 2d 425, 430 (La. App. 4 Cir. 1/19/07).

Finally, the Court notes that the Plaintiffs would obtain an unfair advantage if allowed to pursue their inconsistent position in this litigation. The Plaintiffs argue that they were not aware of Paxil's alleged suicide risk until February 2005, after the conclusion of the first trial in state court. But here, as in the dispute between New Hampshire and Maine concerning the boundary of the Piscataqua River, it cannot be said that the Plaintiffs "lacked the opportunity or incentive" at the time of the previous trial to investigate all possible causes of their father's death. *See New Hampshire*, 532 U.S. at 753-54. Indeed, as demonstrated by one of the cases relied upon by the Plaintiffs in response to a separate motion in this case, juries were hearing evidence concerning the alleged suicide risks associated with Paxil as early as 2001. *See Tobin v. SmithKline*

-14-

*Beecham Pharms.*, 164 F. Supp. 2d 1278 (D. Wyo. 2001). Having benefitted from their prior position, both temporarily (as a result of the trial court's findings) and permanently (as a result of settling with several of the defendants), equity dictates that the Plaintiffs be estopped from asserting an inconsistent position in this case. Accordingly, the Court will also grant GSK's motion invoking the doctrine of judicial estoppel.[8]

## IV.   CONCLUSION

In summary, the Court finds that this case should be dismissed on two independent grounds. First, on the merits, the Plaintiffs' claims fail under each of the LPLA provisions. Second, assuming that any of these claims did not fail on the merits, the Court alternatively finds that the Plaintiffs should be judicially estopped in light of the previous litigation position taken regarding the cause of their father's suicide.

Accordingly, for the foregoing reasons, IT IS ORDERED that GSK's Motion for Summary Judgment on Learned Intermediary (Rec. Doc. 53) is GRANTED and that the Plaintiffs' Motion for Partial Summary Judgment (Rec. Doc. 26) is DENIED IN PART to the extent it addresses the learned-intermediary doctrine.

IT IS FURTHER ORDERED that GSK's Motion for Summary Judgment on Plaintiffs' Remaining Causes of Action (Rec. Doc. 50) is GRANTED.

---

[8] As noted above, the Court need not reach the additional issues raised by the remaining motions in this case. But the Court notes in passing, however, that one of these motions raises the issue of federal preemption, and that the question of preemption in this case would appear to be significantly different than the preemption issue presented in the *In re Vioxx* multidistrict litigation. *See In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 776 (E.D. La. 2007). Indeed, whereas Merck's argument in *In re Vioxx* bordered on being a field-preemption argument, GSK's argument in this case appears to present a true question of conflict preemption. But in light of the above conclusions and the forthcoming decisions from the United States Supreme Court on preemption, this Court will go no further in discussing preemption in the instant case.

IT IS FURTHER ORDERED that GSK's Motion for Summary Judgment on the Basis of Judicial Estoppel (Rec. Doc. 48) is GRANTED.

An appropriate judgment will follow dismissing this case with prejudice.


New Orleans, Louisiana, this 20th day of February, 2008.

                                               UNITED STATES DISTRICT JUDGE